The Gem Jewelry Company, Inc. v. Commissioner.
Gem Jewelry Co. v. Commissioner
Docket No. 8921.
United States Tax Court
1947 Tax Ct. Memo LEXIS 340; 6 T.C.M. (CCH) 11; T.C.M. (RIA) 47001; January 13, 1947
Harry Dow, Esq., First National Bank Bldg., Houston, Tex., for the petitioner. Frank B. Schlosser, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: This is an appeal from a determination by the Commissioner of income, declared value excess profits and excess profits taxes for the fiscal year ending July 31, 1941, in the following amounts: Income Tax
$7,231.79
Declared Value Excess Profits
1,724.84
Excess Profits Tax
6,971.02
Three questions are presented for determination: (1) Under the evidence of record in this case, *341 what constitutes a reasonable allowance as officers' salaries for services actually rendered to petitioner? (2) Is petitioner entitled to include in its equity invested capital as paid-in surplus, the sum of $30,000, or any part thereof? (3) Did respondent err in restoring to taxable income the sum of $7,157.99 representing a ten per cent write-down in petitioner's closing inventory? Findings of Fact Petitioner was incorporated under the laws of Louisiana on January 16, 1940, with an authorized capital of $10,000, all of which was paid in to the corporation by M. L. Jacobs and J. Jacobs, with an agreement that whatever future payments Herman Fleckman would make would be made directly by Fleckman to the Jacobs brothers. Its income and excess profits tax returns for the taxable year ended July 31, 1941, were filed with the collector of internal revenue for the district of Louisiana. Its officers, during the taxable year, were: M. L. Jacobs, President; J. Jacobs, Vicepresident; Herman Fleckman, Secretary-treasurer. It reported income for the taxable year as follows: Amount
Gross Sales
$194,503.59
Cost of Goods Sold
88,434.23
Gross Profit on Sales
$106,069.36
Add: Discounts Earned
$ 764.01
Total Gross Income
$106,833.37
Deductible Expenses, Including Offi-
cers Salaries
88,210.18
Net Earnings
$ 18,623.19
*342 The following statement shows the amounts deducted by petitioner as officers' salaries, the amounts allowed and the amounts disallowed by respondent: Salaries
Dis-
Officers
Deducted
Allowed
allowed
M. L. Jacobs,
President
$12,000.00
$ 4,800.00
$ 7,200.00
J. Jacobs, Vice-
President
12,000.00
2,600.00
9,400.00
Herman Fleck-
man, Secre-
tary-Treasurer
8,400.00
6,000.00
2,400.00
$32,400.00
$13,400.00
$19,000.00
M. L. Jacobs and J. Jacobs are brothers, who, during and prior to the taxable year, were members of a partnership known as The Gem Jewelry Company with retail jewelry stores in Beaumont, Texas, and Port Arthur, Texas. The following statement shows the gross sales and net income of said partnership for the calendar year 1940, the period from January 1 to July 31, 1941, and the period from August 1 to July 31, 1942: Net
Gross Sales
Income lCalendar year 1940
$226,532.48
$44,732.93
January 1 to July 31, 1941
118,195.33
32,108.04
Aug. 1, 1941, to July 31,
1942
321,132.45
63,883.68
M. L. Jacobs lived in Beaumont and managed the partnership store there while J. Jacobs was the manager of the *343 partnership store at Port Arthur where he resided. Herman Fleckman, secretary and treasurer of petitioner, lived in Alexandria, La., and managed petitioner's store there. Prior to his connection with petitioner Fleckman was bookkeeper at the Beaumont store of the partnership at a salary of $2,400 per year, plus an undetermined bonus. At Alexandria he received the same initial salary but was subsequently paid $6,000, which amount was entered in petitioner's income tax return in the classification of "compensation of officers." The $2,400 was returned along with the income of eleven or twelve other employees under the classification "salaries and wages", amounting to $20,075.55. Petitioner handled many items of jewelry, fifty to six per cent of its sales being diamonds and watches, of which approximately half were diamonds. On August 10, 1941, the minutes of the directors meeting show a salary authorization for the fiscal year ending July 31, 1941, as follows: M. L. Jacobs
$12,000.00
J. Jacobs
12,000.00
Herman Fleckman
8,400.00 at which time, according to the minutes of the stockholders meeting of August 15, 1940, which were introduced by the petitioner at the *344 trial, the stockholdings of the officers were as follows: M. L. Jacobs
44 shares
J. Jacobs
36 shares
Herman Fleckman
20 shares but a certified copy of the minutes of the same meeting submitted by petitioner to the examiner and introduced by the Commissioner in evidence shows the stockholdings as follows: M. L. Jacobs
40 shares
J. Jacobs
40 shares
Herman Fleckman
20 shares
It is our finding that the preponderance of the evidence establishes that the latter ratio of shareholdings reflects the true situation of petitioner corporation. No dividends were paid by petitioner during the years 1941 and 1942. Petitioner's inventory at the close of the taxable year was taken at cost in the amount of $71,579.93. Thereafter petitioner reduced the value of the inventory by a blanket mark-down of ten per cent, or $7,159.99. This inventory was taken on the basis of "cost or market." On August 15, 1940, the stockholders meeting authorized the acceptance from M. L. Jacobs and J. Jacobs of a contribution to capital of $30,000, representing the value of merchandise sold and delivered to petitioner by M. L. Jacobs and J. J. Jacobs. On July 31, 1941, an *345 entry to this effect as of August 1, 1940, was made on petitioner's books by its certified public accountant. The income tax return for the fiscal year ended July 31, 1940, was filed on March 13, 1941, and did not reflect this contribution to paid-in surplus. M. L. Jacobs and J. Jacobs are men of long experience in the purchasing, assembling and mounting of diamonds and M. L. Jacobs has had about thirty-six years experience in the jewelry business. During the taxable year they made a trip together to Cuba; J. Jacobs made a second trip to Cuba; and M. L. Jacobs made a second trip to Mexico to buy diamonds. These diamonds were bought for the partnership and some of them were in turn delivered to petitioner corporation "at cost." The president and vice-president made two trips to the eastern markets at no expense to the corporation. Each of the brothers averaged one trip per month to Alexandria for which no charge was made to the corporation and in addition thereto frequent telephone calls were made between Alexandria and Port Arthur, and Beaumont, the exact numbers of which are set forth in the stipulation to which reference is made. The president and vice-president extended *346 their personal credit for the benefit of petitioner corporation and the corporation procured the benefit of the wholesale purchases made for petitioner and the two partnership stores. Opinion Issue I The reasonableness of salaries is althogether a question of fact as applied to a particular case. Therefore little if any help can be obtained from precedents. The presumption, of course, is that the determination of the Commissioner on the reasonableness of the salary deduction is correct; and this presumption must be overcome, if at all, by credible evidence produced at the hearing. In this case two of the officers of petitioner whose salaries are in question, J. Jacobs and Herman Fleckman, did not testify. Petitioner relied on the testimony of a traveling diamond salesman who knew something of the jewelry business and who was familiar with petitioner's store and also the testimony of M. L. Jacobs, its president. Jacobs' testimony is that he and J. Jacobs purchased petitioner's merchandise at a great saving; that in the taxable year two trips were made to Cuba, one to Mexico and two to the eastern markets to purchase diamonds and jewelry supplies; that either M. L. Jacobs or *347 J. Jacobs made almost daily phone calls to petitioner's store; that an average of one personal visit a month was made to the store by either M. L. Jacobs or J. Jacobs; that both M. L. Jacobs and J. Jacobs helped finance the corporation by procuring loans and by endorsing credit purchases; and that these two men procured merchandise for petitioner on the market when it was very difficult to get. It is difficult to give much of this testimony the weight which it might otherwise carry, owing to the fact that M. L. Jacobs and J Jacobs were partners having jewelry stores in Beaumont and Port Arthur and when petitioner was incorporated to operate a store in Alexandria, Louisiana, the Jacobs brothers bought all of the capital stock issued by the corporation. Although the brothers delivered twenty shares of this stock to Fleckman, the Alexandria store manager, Fleckman paid nothing for that stock to the corporation and at least for the first two years never received any dividends. To all practical intents and purposes the Jacobs brothers owned the Alexandria store to the same extent as they did their stores in Beaumont and Port Arthur. In practically all of their activities they were performing *348 necessary services for the partnership and the record is not clear as to the real extent of any additional acts they did because of their ownership of the Alexandria store. While the absorption of all earnings by officer's salaries, the payment of salaries in proportion to stockholdings, and the voting of a salary or bonus after the taxable year will not in themselves make such compensation unreasonable, still such a situation is a factor to consider in determining whether the compensation granted is really salary or bonus, or a distribution of dividends. We are unable to find that on the question of salaries for M. L. Jacobs and J. Jacobs sufficient evidence has been introduced to overcome the determination of the Commissioner in disallowing these deductions. However, as to the salary of Fleckman, this man was required to move from Beaumont to Alexandria and establish a new home. He had been receiving some payments in the nature of a bonus over his regular salary of $2,400 in Beaumont. In his new position he had supervision over eleven or twelve employees and, although according to the evidence, all questions of major policy and the buying of important merchandise were determined *349 by the Jacobs brothers, nevertheless the store actually sold merchandise in the amount of $194,503.59 and it is our determination that all of these facts are of sufficient weight to overcome the determination of the Commissioner and in our opinion the salary of $8,400 paid to Fleckman was not unreasonably large. Issue II Is petitioner entitled to include in its equity invested capital for the purpose of determining its excess profits tax the sum of $30,000 claimed to have been contributed to its paid-in surplus? On August 15, 1940, the minutes of the stockholders' meeting contained the following: Discussion was also brought up by M. L. Jacobs regarding the amount of $33,501.86 due M. L. Jacobs and J. Jacobs by Gem Jewelry Company, Inc., of Alexandria, La., for Merchandise sent to Alexandria by them, and motion was made by J. Jacobs, that since the amount of authorized Capital of the Company of $10,000.00 being inadequate to aloow the Company to carry the inventories needed, that an amount of $30,000.00 of this amount be set up as paid-in surplus. Motion was seconded by M. L. Jacobs, and carried by majority vote. It was then agreed among the Stockholders that settlement be *350 made by H. Fleckman with M.L. & J. Jacobs for his participating interest in such paid in surplus. The auditor testified that he was told to make the necessary entries in petitioner's books to transfer $30,000 from accounts payable to paid-in surplus, but that he directed one of his assistants to do the work (whose name was not supplied) and that the assistant neglected to carry out his instructions. The Court was not given the benefit of the testimony of the unnamed assistant on this point. On July 31, 1941, the auditor who was also the auditor of the Jacobs partnership, made such an entry on petitioner's books "as of August 1, 1940". No action of the stockholders or directors is recorded authorizing the effective date of this entry to be advanced 15 days prior to the meeting of August 15, 1940. The record is also blank as to any contribution Fleckman may have made to this paid-in surplus. In appraising this situation the first persuasive factor is that the reason for this transfer, as expressed in the resolution, is not apparent. The only handicap of under-capitalization is a limitation of credit, yet M. L. Jacobs testified in support of his salary allotment that he and his brother *351 personally guaranteed both loans and credit purchases for petitioner. He also testified that petitioner made exceptionally large profits on their business, in fact 55 per cent, gross profit on the sales. If that portion of the amount which petitioner paid for salaries and which the Commissioner disallowed, were added to the amount of the deduction on the appraisal, in one year's time petitioner would have had available almost enough money to pay this $30,000 account. At no time during the taxable year apparently was petitioner short on cash, inasmuch as it earned discounts by prompt payment of bills in the amount of $764.01. We see little in the financial position of the petitioner to require any gift by M. L. Jacobs and J. Jacobs to its paid-in surplus. The auditor testified that from August 15, 1940, to July 31, 1941, the Jacobs partnership rendered petitioner no bills for this amount. There is likewise no evidence that any bills were rendered prior to August 15, 1940, and it would seem to be a rather futile thing at any time for M. L. Jacobs and J. Jacobs to send statements to themselves as the Gem Jewelry Company, Inc., in order to collect their own accounts. Furthermore, it *352 seems strange that such a shrewd dealer and businessman as M. L. Jacobs admits himself to be, would join with his brother in making a $30,000 contribution to petitioner's paid-in surplus and not, at that time and place, or, so far as the record shows at any time and place, require Fleckman, who owned one-fifth of petitioner's stock, to contribute his share. It is interesting to note also that on March 13, 1941, after many delays, petitioner filed its income tax return for the fiscal year 1940. In preparing this return the auditor's attention would necessarily be drawn to the capital and surplus account of petitioner, and the "oversight" of the auditor's assistant in not making the directed entry would almost inevitably have come to the auditor's attention. The auditor says that since he was preparing the return for 1940 and since the addition to surplus was an item for the 1941 return, he did not notice this situation. This explanation is not wholly satisfying to a Court trying to resolve the question as to whether prior to July 31, 1941, petitioner had, in truth, really made any provision for an addition to paid-in surplus; or whether such an idea arose at the end of the fiscal *353 year when the bookkeeping entry was made. In addition, it is provided in section 8722 of the Louisiana General Statutes, as follows: After determining the correct amount of its capital stock, surplus and undivided profits, * * * said corporation shall pay a tax of $2.00 for each $1,000 on the amount of its capital stock surplus and undivided profits. The Louisiana Statutes also provide that this report shall be made once in each calendar year. Hence, it was incumbent upon petitioner to submit such a report in 1940 and 1941. By failing to make the entry of the addition to paid-in surplus, until July 31, 1941, it would seem to be evident that petitioner would save either $60 or $120 in Louisiana State taxes, depending upon whether or not the report was required before or after July 31 of each year. And it certainly is unthinkable that the auditor in preparing this report for 1940 and 1941 would not have had his attention called directly to the paidin surplus account. Oversights of this character are not persuasive on the court of the bona fides of this paid-in surplus transaction. Also, we cannot eliminate from our thinking the fact that the excess profits tax law, [1] including *354 the provision for equity invested capital, was approved by the President on October 8, 1940. A similar act for the First World War did not include a provision for allowing an equity invested capital credit for property other than money delivered to a corporation, and it is not surprising that petitioner's auditor, who says himself that he was a very busy man, probably overlooked the potent tax saving possibilities of this unprecedented provision in the 1940 excess profits tax law, until July 31, 1941. We find that sufficient testimony has not been introduced to overcome the determination of the Commissioner in disallowing this contribution *355 to paid-in surplus until July 31, 1941. Issue III Did the Commissioner correctly disallow petitioner's ten per cent markdown in inventory? In making its inventory, petitioner's manager, Fleckman and the clerks took the cost of each item amounting in all to $71,579.93 and then made a blanket mark-down therefrom of 10 per cent, leaving an inventory value of $64,421.94. Neither M. L. Jacobs nor J. Jacobs was present at the inventory. The petitioner justifies this mark-down in order to cover shelf wear, out moding fashions, market fluctuations and damage. The Commissioner asserts that the inventory does not reflect either cost or market value and was taken in violation of the provisions of the Treasury Regulations. [2] These Regulations in substantially the same wording are of a long standing and have not been disturbed by frequent additions to the revenue law by Congress. *356 The Congressional approval of existing Treasury Regulations by reenactment of the Statutory provisions to which they appertain gives such regulations the force of law. . Petitioner, however, relies largely upon , in which in some departments of a department store the buyers who were experts in market values took inventory and testified that the reductions taken achieved a substantial market value. In that case also the report of the examiners declared that an accurate inventory was impossible "at a time when prices are dropping rapidly". In the case at bar the man who made the inventory was not a buyer, he was not an expert in the market, he did not testify that the final result represented the market price (in fact he did not testify at all); and there is no evidence of a falling market, in fact quite the contrary. Petitioner also relies upon , the syllabus of which reads as follows: Where return of owner of a retail stock of merchandise under Revenue Act 1918, § 203 (Comp. St. § *357 6336 1/8c), some of which was bought in previous years, contained an inventory at cost prices, and made a deduction of a percentage of the total in stating the market value, such owner is not precluded from showing by evidence that such deduction was reasonable, and made by the method in general use, and the action of the Board of Tax Appeals in disregarding such evidence and disallowing any deduction held arbitrary and unwarranted. In this case the merchandise involved consisted of hardware, dry goods and groceries, and the decision says that it was admittd that such goods decreased in value after purchase. The Board of Tax Appeals had precluded the taxpayer from showing that a 25 per cent general inventory mark-down represented a true market value. In the case at bar there was no effort to prevent the taxpayer from showing that a 10 per cent discount represented a true market value. The difficulty with the case at bar is that the taxpayer failed to introduce persuasive evidence on this point. When we examine the admitted facts in this case it would seem to be evident that there was certainly no justification for any mark-down at all. M. L. Jacobs testified that he purchased *358 unmounted diamonds for petitioner at wholesale. He purchased $8,000 worth of these gems which he said, if they had been purchased on the American market through salesmen would have been worth $18,000. He purchased the watches, jewelry and mountings on the eastern market at wholesale prices and petitioner was not charged any buying expense therefor or broker's commission. He assembled and mounted the gems in his Beaumont store and charged petitioner only the actual cost thereof. As a result of these extremely low costs, which were below the market, petitioner made a gross profit of 55 per cent on its sales as against a profit of 42 per cent made by jewelry stores generally who purchased on the open market. The diamond salesman witness testified that Jacobs purchased his own merchandise cheaper than a wholesale broker could sell them. Furthermore, approximately 60 per cent of petitioner's business consisted in the sale of diamonds and watches on which, in the very nature of things, there could hardly be material shelf damage. In the absence of any testimony to the contrary, we believe it to be a reasonable assumption that approximately 60 per cent of petitioner's stock would also consist *359 of diamonds and watches. Practically all of the loss due to change in styles, shelf wear, etc., would occur in the costume jewelry and other items of petitioner's merchandise which constituted therefore but 40 per cent of its stock. To make an over-all mark-down of 10 per cent of the entire stock, with the basis for the markdown being confined to but 40 per cent thereof, does not appeal to us as being a reasonable proceeding, at least, in the absence of testimony from the man who made the appraisal and authorized the mark-down. It should be remembered also that this stock had all been purchased after January 10, 1940. It was all new stock and a pronounced style change between that date And July 31, 1941, would not seem to be probable in the absence of specific testimony. M. L. Jacobs also testified that at least from the beginning of 1941 the chief problem of the Alexandria store, which was then near a large military training camp, was to get merchandise to sell. The demand was very great. M. L. Jacobs justified his salary in fact, on the ground that he was able to get merchandise for this store when other dealers were unsuccessful. Under such circumstances we would require more *360 testimony than the mere opinion of M. L. Jacobs that a 10 per cent mark-down was proper, especially when such a mark-down means a material tax saving to the witness. It is our opinion from all of the testimony that the inventory at cost in this case was actually lower than an inventory which could be made at the market and we do not find any testimony in the record to contravert the Commissioner's action in disallowing this mark-down. Our main difficulty with petitioner's position in this case is that its testimony, introduced to justify the payment of executive salaries, concerning the liberal use of the credit of M. L. Jacobs and J. Jacobs and the efficient service of these two men in buying at less than market cost, all makes petitioner's contention on the contribution to paid-in surplus and the inventory markdown unacceptable and yet such testimony is not a sufficient weight to justify the salaries claimed, under circumstances where petitioner corporation and the Jacobs partnership are, for all practical purposes, one business organization. Furthermore, the issuing of the stock certificates at a different ratio than was originally contemplated, the entering of a $30,000 contribution *361 to surplus, the 10 per cent mark-down of inventory, the voting of very large salaries after the close of the fiscal year and the failure to declare any dividends on the stock, all occurring within one month's time and after the earnings for the year had been definitely determined, all indicate a design to evade income taxes. In our opinion the determination of the Commissioner should be sustained on the question of the reasonableness of salaries paid to M. L. Jacobs and J. Jacobs; on the disallowance of the $30,000 contribution to paid-in surplus; and on the disallowance of the 10 per cent mark-down of inventory. The position of the petitioner should be sustained on the reasonableness of the salary of Herman Fleckman. Decision will be entered under Rule 50. Footnotes
1. SEC. 718. EQUITY INVESTED CAPITAL. (a) Definition. - The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b) - (1) Money Paid In. - Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital; (2) Property Paid In. - Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. * * *↩
2. REGULATONS 103. Sec. 19.22(c)-2. * * *
(2) * * * The basis of valuation most commonly used by business concerns and which meet the requirements of section 22(c) are (a) cost and (b) cost or market, whichever is lower. * * * Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition. * * * The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made. * * *
Sec. 19.22(c)-4. (b) * * * Where the inventory is valued upon the basis of cost or market, whichever is lower, the market value of each article on hand at the inventory date shall be compared with the cost of the article, and the lower of such values shall be taken as the inventory value of the article.↩